Scott C. Glovsky, Bar No. 170477
Email: Sglovsky@scottglovskylaw.com
Ari Dybnis, Bar No. 272767
Email: Adybnis@scottglovskylaw.com
LAW OFFICES OF SCOTT GLOVSKY, APC
343 Harvard Avenue
Claremont, CA 91711
Website: www.scottglovsky.com
Telephone: (626) 243-5598
Facsimile: (866) 243-2243

Attorneys for Plaintiffs

**FILED**
Superior Court of California
County of Los Angeles
06/10/2020
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____L. Castillejo_____ Deputy

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| JACKIE SALDANA, CELIA SALDANA, RICARDO SALDANA JR., and MARIA SALDANA, as individuals and as successors and heirs of RICARDO SALDANA, deceased,<br><br>Plaintiffs,<br><br>vs.<br><br>GLENHAVEN HEALTHCARE LLC, a California corporation; CARAVAN OPERATIONS CORP., a California corporation; MATTHEW KARP, an individual; BENJAMIN KARP, an individual, and DOES 1 through 100, inclusive,<br><br>Defendants. | Case No.: 20STCV19417<br><br>[Assigned to Hon. Michelle Williams Court in Dept. 74]<br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. Elder Abuse;<br>2. Willful Misconduct;<br>3. Custodial Negligence; and<br>4. Wrongful Death.<br><br>Complaint filed: May 21, 2020 |

Plaintiffs allege with respect to their own acts and on information and belief with respect to all other matters:

## GENERAL ALLEGATIONS

**1.**

## INTRODUCTION

1. This is a case about profits over people. The Saldana family trusted the Glenhaven Healthcare nursing home to care for and protect Ricardo Saldana. Glenhaven grossly betrayed their trust. During the midst of the deadly coronavirus pandemic, Glenhaven intentionally concealed that a working staff member had been heavily exposed to the coronavirus while prohibiting its staff members from wearing masks and gloves. As a result, roughly ten patients, including Ricardo Saldana, were infected with the coronavirus and died.

2. Ricardo Saldana's wife and children bring this action against Glenhaven for Ricardo's wrongful death. Glenhaven took intentional and cruel actions in its response, and lack thereof, to the coronavirus until it was too late. It failed to provide any protective equipment such as masks to employees, prohibited employees from bringing or wearing their own protective equipment, and went so far as to lock up protective equipment that the local fire department delivered. Glenhaven took no precautions to identify or isolate employees or residents infected with or exposed to the virus. To the contrary, it concealed its knowledge that an employee had been exposed to the virus for roughly two weeks and had the employee interact with other employees and residents. Similarly, it moved a resident who was exposed to the virus into Ricardo's room without telling Ricardo or his family.

3. Glenhaven sought to avoid scrutiny from local regulators, to save money, and to minimize the knowledge of existence of the virus to the residents and employees until it was too late. As a result, the virus ran rampant through Glenhaven's facility, infecting residents and employees.

## 2.

## THE PARTIES

4.  Decedent Ricardo Saldana ("Ricardo") resided, at all times herein mentioned, in Los Angeles County. While alive, Ricardo lived for the last approximately six years of his life in the Glenhaven Healthcare nursing home in Glendale, California. He died from the coronavirus on or about April 13, 2020.

5.  Plaintiff Celia Saldana ("Celia") resides, now and at all times herein mentioned, in Los Angeles County. Ricardo is Celia's late husband.

6.  Plaintiff Jackie Saldana ("Jackie") resides, now and at all times herein mentioned, in Los Angeles County. Ricardo was Jackie's father.

7.  Plaintiff Ricardo Saldana Jr. ("Ricardo Jr.") resides, now and at all times herein mentioned, in Los Angeles County. Ricardo was Ricardo Jr.'s father.

8.  Plaintiff Maria Saldana ("Maria") resides, now and at all times herein mentioned, in Los Angeles County. Ricardo was Maria's father.

9.  Ricardo has no other living immediate relatives other than Celia, Jackie, Ricardo Jr. and Maria (collectively the "Plaintiffs"). Plaintiffs are the successors in interest to the Decedent Ricardo Saldana and with this complaint is an executed affidavit in compliance with CCP § 377.32, and thereby proceeds as successor in interest to the claims of Decedent Ricardo Saldana as stated herein, and brings this action as individuals as such. See Declaration of Jackie Saldana attached as Exhibit 1. Plaintiffs brings this combined survival action on behalf of Ricardo's estate and also this wrongful death action under the provisions of Code of Civil Procedure § 377.60 which provides that Plaintiffs, as the personal representative of the Decedent, may bring this wrongful death action on behalf of the decedent's heirs: "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by … by the decedent's personal representative on their behalf."

10. Defendant Glenhaven Healthcare, LLC ("Glenhaven") is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of

California and authorized to transact and transacting business in the State of California, with its headquarters in the County of Los Angeles.

11. Defendant Caravan Operations Corp. ("Caravan") is, and at all relevant times was, a corporation duly organized and existing under and by virtue of the laws of the State of California and authorized to transact and transacting business in the State of California, with its headquarters in the County of Los Angeles.

12. Defendant Matthew Karp is, and at all relevant times was, a resident of the County of Los Angeles.

13. Defendant Benjamin Karp is, and at all relevant times was, a resident of the County of Los Angeles.

14. Upon information and belief, Matthew Karp and Benjamin Karp are the sole owners of Caravan and Glenhaven. There exists, and at all times mentioned existed, a unity of interest and ownership between Defendants Matthew Karp, Benjamin Karp, Caravan and Glenhaven such that any individuality and separateness between them has ceased, and defendant Caravan and Glenhaven are the alter ego of each other defendant that Caravan and Glenhaven are, and at all times herein mentioned were, a mere shell, instrumentality, and conduit through which defendants Matthew Karp and Benjamin Karp carried on their nursing home business. These Defendants intermingle monies and do not respect the corporate formalities necessary to operate as separate entities. As a result, these defendants are collectively referred to herein as "Glenhaven."

15. Adherence to the fiction of the separate existence of defendants as entities distinct from each other would permit an abuse of the corporate privilege and would promote injustice by protecting Defendants Caravan, Matthew Karp, and Benjamin Karp from prosecution for the wrongful acts committed by them under the name Glenhaven.

16. Additionally, Plaintiffs are informed and believe that Defendants were in a joint venture to provide nursing home services that are the subject of this lawsuit. They combined their property, skill, and knowledge with the intent to carry out a single business undertaking. Each of

the Defendants has an ownership interest in the business and joint control over the business and share the profits and losses of the business.

17. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as Does 1 through 100, inclusive, are unknown to plaintiff, who therefore sues said Defendants by such fictitious names.  Each of the Defendants named herein as a Doe is responsible in some manner for the events and happenings hereinafter referred to, and some of plaintiff's damages as herein alleged were proximately caused by such defendants.  Plaintiffs will seek leave to amend this complaint to show said Defendants' true names and capacities when the same have been ascertained.

18. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named herein as Does 1 through 100, inclusive, are unknown to plaintiffs, who therefore sue said defendants by such fictitious names.  Each of the Defendants named herein as a Doe is responsible in some manner for the events and happenings hereinafter referred to, and some of plaintiffs' damages as herein alleged were proximately caused by such defendants.  Plaintiffs will seek leave to amend this complaint to show said Defendants' true names and capacities when the same have been ascertained.

19. At all times mentioned herein, each of the Defendants was the agent or employee of each of the other Defendants, or an independent contractor, or joint venturer, and in doing the things herein alleged, each such Defendant was acting within the purpose and scope of said agency and/or employment and with the permission and consent of each other Defendant.

**3.**

**FACTUAL BACKGROUND**

20. Ricardo Saldana was an elderly resident of Glenhaven's nursing home in Glendale, California.  In May of 2014, he suffered from a stroke and was admitted to Verdugo Hills Hospital.  After a couple of weeks in the hospital he stabilized and Verdugo Hills discharged him to Elms Convalescent Hospital, a skilled nursing facility.  In or about 2017 or 2018, Elms Convalescent Hospital was acquired by Glenhaven.

21. At all times relevant, Ricardo had impairments that required total care. He was in the custody of Glenhaven and wholly dependent upon Glenhaven for all activities of daily life, including food and feeding, clothing, laundry, hydration, hygiene, mobility, medication, and treatments. He was also totally dependent upon Glenhaven for nursing care to assess changes in his condition, to report changes in his condition to the attending physician, and when appropriate to arrange for him to be transferred to a hospital.

22. At all times mentioned, Glenhaven accepted the responsibility to provide such caretaking and custodial services and had custody of Ricardo. Each of these services are services which a nursing facility operator is required by law to provide. (Health & Safety C. § 1418.6; 22 CCR. §§ 72301, 72303, 72527(a)(3), 72527(a)(12).) Despite Ricardo's impairments and need for assistance, up until March of 2020 he was stable and still able to interact with his wife Celia and children, Jackie, Maria and Ricardo Jr.

23. On January 20, 2020, the first case of coronavirus infection in the United States appeared. By March 4, 2020, the virus spread to such an extent and posed such a danger that California's Governor, Gavin Newsom, declared a state of emergency in California. On the same day, the Los Angeles County Board of Supervisors and the Los Angeles County Department of Public Health similarly declared a local and public health emergency in the County of Los Angeles.

24. The elderly and particularly those with underlying health problems are most vulnerable to the coronavirus. In late February, a coronavirus outbreak at a nursing home in Washington infected two-thirds of its residents and killed 37 people. The media widely covered this story. It became quickly apparent that nursing homes needed to promptly take reasonable measures to protect their patients from exposure to the coronavirus. Such measures include testing of residents and employees, restricting visitors, requiring employees to use face masks, gloves, and gowns, and isolating employees and residents who are suspected or known carriers of the virus.

25. At the same time that California and Los Angeles County were declaring a state of emergency, Glenhaven failed to implement appropriate safety measures. To the contrary,

Glenhaven's leadership was stopping its staff from protecting themselves and the residents. Glenhaven was primarily operated by two people. Carrie Marks ("Marks") is the head administrator of the facility and Marco Gary ("Gary") heads the department of staff development and is himself a nurse. Both of these individuals have the ability to hire and fire staff and Marks is an employee of both Glenhaven and Caravan.

26. Through March of 2020, Glenhaven did not provide employees with any personal protective equipment ("PPE"). On a number of occasions, members of the nursing staff brought their own masks and bandanas to wear while working because of their concerns for the virus. Gary told such staff members to take off their masks and bandanas and that they were not allowed. When Gary told one nurse that she was not allowed to wear a mask, she told him that she was sick and needed to wear a mask to protect the patients and employees. Despite her pleading, and her illness, Gary responded that she was not allowed to wear a mask.

27. Employees questioned Gary and Marks about this policy. They responded that the protective items were not necessary because no one would get sick. In mid-March of 2020, the local fire department even delivered boxes of masks to the facility. Instead of distributing the masks to staff, Marks locked the masks in a cabinet and would not allow employees to use them.

28. Around the same time, Susana San Andreas, a nurse working at Glenhaven, advised Marks that she had also been working at a facility in Burbank which was being shut down because of uncontrolled COVID-19 infections and that residents there exposed her to the virus. Glenhaven did not tell any of the staff about San Andreas' exposure and continued to allow San Andreas to work at Glenhaven.

29. Roughly a week later, Marks held a staff meeting at Glenhaven. Marks downplayed the virus and reassured the staff that no one was getting sick. She compared the coronavirus to the flu. She did not mention San Andreas' exposure.

30. Around this time, a staff member at Glenhaven called Jackie and told her about her concerns for Ricardo because Glenhaven was not allowing staff to wear masks. She begged Jackie to contact the government regulators. Jackie called the Department of Public Health and reported the situation.

31. Approximately a week later, on or about April 1, 2020, Marks held a second in-service at Glenhaven where she told staff that a nurse had been exposed to the virus. She also said that she and the rest of the supervisors would no longer hide anything. She advised staff that Glenhaven would start allowing masks to be worn, but only masks provided by Glenhaven. Following the meeting, Glenhaven provided paper surgical masks to the staff but only permitted each staff member to use one mask per eight-hour shift.

32. Even through April of 2020 as Glenhaven began to provide first paper masks and then other items such as disposable gowns, supply continued to be a problem. Glenhaven frequently ran out of masks and gowns forcing staff to finish out hours of their shifts without clean equipment rather than purchasing additional equipment for the facility.

33. Even though Glenhaven had begun to implement some safety measures in early April, the virus had already spread through the staff and residents. It was not until on or about April 7th through on or about April 9th that the facility began to test staff and patients. Before that, Glenhaven knew that it had staff and residents who were both exposed to the virus and who also carried the virus yet it was not testing people. Glenhaven was not doing so specifically for fear that there would be positive results which it would then need to report. The testing that was conducted did in fact identify people with the virus.

34. Despite its awareness of the virus in the facility and minor steps that it took to address the spread, the leadership at Glenhaven still did not implement an effective policy for isolating proven or suspected carriers of the coronavirus. As a result, Glenhaven transferred a resident who had shared a room with a COVID-19 positive resident to a two bed room with Ricardo in late March.

35. Prior to this move, Ricardo did not show any signs or symptoms. Once the other person was moved into the room with Ricardo, he began to develop a fever and other symptoms of the coronavirus. Ricardo's condition continued to degrade. Ultimately, Ricardo died on April 13, 2020 from the coronavirus. His death was the direct result of Glenhaven's actions and omissions.

**4.**

**FIRST CAUSE OF ACTION**

**(ELDER ABUSE)**

PLAINTIFFS FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100, INCLUSIVE, AND EACH OF THEM, FOR ELDER ABUSE, ALLEGE:

36. Plaintiffs incorporate by reference each and every paragraph of the General Allegations as though set forth in full in this cause of action.

37. Ricardo was at all times elderly within the meaning of Welf. & Inst. C. § 15610.27 owing to the fact that he resided in the State of California, and was over the age of 65.

38. At all times mentioned, each of the defendants had care or custody of the Ricardo.

39. By virtue of the foregoing, Defendants and each of them have failed to protect Ricardo from health and safety hazards and committed neglect as defined at Welf. & Inst. Code § 15610.57.

40. During the aforesaid periods during which Defendants and each of them had care or custody of the Deceased, he was intentionally and/or recklessly exposed to the coronavirus and not provided with basic necessary custodial care such as feeding or bathing by Glenhaven employees in appropriate protective equipment. Defendants deprived him of services that were necessary to avoid physical harm and mental suffering and failed to provide adequate funding and staffing to ensure that the nursing home provided necessary care for him.

41. By virtue of the foregoing, at all times during their care and treatment of the Deceased, Defendants have acted with recklessness.

42. By virtue of the foregoing, in addition to pre-death pain and suffering damages under Welf. & Inst. Code § 15657, Plaintiffs are entitled to attorneys' fees unilaterally to them, under the same provision of law.

43. Ricardo has been harmed by Defendants' conduct as described herein. The pattern of substandard care and neglect put her at extremely high risk for infection and resulting complications, including injury and death. Defendants' conduct was a substantial factor in

9

causing Ricardo to suffer physical, emotional, and economic harm, as well as other damages in an amount to be determined according to proof.

44. Defendants' conduct described herein was intended by the defendants to cause injury to plaintiffs or was despicable conduct carried on by the Defendants with a willful and conscious disregard of the rights of Plaintiffs, or subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights, or was an intentional misrepresentation, deceit, or concealment of a material fact known to the defendants with the intention to deprive Plaintiffs of property, legal rights or to otherwise cause injury, such as to constitute malice, oppression or fraud under California Civil Code section 3294, thereby entitling Plaintiffs to punitive damages in an amount appropriate to punish or set an example of Defendants.

45. Defendants' conduct described herein was undertaken by the corporate Defendants' officers or managing agents, identified herein as DOES 1 through 100, inclusive, who were responsible for claims supervision and operations, underwriting, communications and/or decisions. The aforementioned conduct of said managing agents and individuals was therefore undertaken on behalf of the corporate Defendants. Said corporate Defendants further had advance knowledge of the actions and conduct of said individuals whose action and conduct were ratified, authorized, and approved by managing agents whose precise identities are unknown to Plaintiffs at this time and are therefore identified and designated herein as DOES 1 through 100.

**5.**

## SECOND CAUSE OF ACTION

**(Willful Misconduct)**

PLAINTIFFS FOR A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100, INCLUSIVE, AND EACH OF THEM, FOR WILFUL MISCONDUCT, ALLEGE:

46. Plaintiffs incorporate by reference each and every paragraph of the General Allegations as though set forth in full in this cause of action.

47. At all times during the periods of their care of Ricardo, each defendant knew or should have known that their failure to comply with the standard of care, by providing care in which healthcare providers lacked appropriate safety equipment, and by not employing reasonable custodial policies for isolating COVID positive residents, all posed a peril to the Deceased.

48. At all times mentioned during the periods of their care of the Deceased, each defendant knew or should have known that the peril posed by their failure to their failure to comply with the standard of care, by providing care which a health care providers in appropriate safety equipment and employing reasonable custodial policies for isolating COVID positive residents, exposed Ricardo to the high probability of his injury or death.

49. At all times mentioned above Defendants, and each of them, knowingly disregarded the aforesaid peril and high probability of injury and in doing so failed to comply with their duties under the standard of care as set forth above, as follows:

(a) Forbidding staff from wearing appropriate PPE;

(b) Failing to provide staff with PPE;

(c) Failing to provide staff with adequate PPE;

(d) Failing to isolate suspected or identified COVID-19 carriers from staff or residents;

(e) Failing to disclose known or suspected COVID-19 carriers to staff and/or residents;

(f) Failing to take all reasonable and necessary precautions to ensure that Ricardo did not contract COVID-19;

(g) Failing to test Ricardo and other residents and staff for COVID-19 to quickly address and isolate if necessary; and

(h) Failing to treat Ricardo with respect, dignity and without abuse.

50. Defendants had made certain financial and budgetary decisions - at the highest corporate levels - regarding their operation based solely on the need to enhance the profitability of their operation. Among these decisions was the decision to limit its purchase of PPE such that it could not meet the needs of its residents, including Ricardo. As a foreseen and predictable result of these cut-backs, residents and patients - including Deceased - were exposed to the coronavirus.

These changes were knowingly in violation of basic and humane care responsibilities.

51.     Plaintiff is informed and believes, and thereon alleges, that in the days leading up to Ricardo's death, and continuing through his death, Defendants, at all times mentioned, were under a statutory duty to comply with all applicable federal and state laws and regulations governing nursing homes in California, including but not limited to the following:

(a) 42 CFR §483.10(a) & (e) (respect, dignity, & without abuse);

(b) 42 CFR §483.21 (care plan);

(c) 42 CFR §483.25 (quality care must be provided; protecting for health and safety hazards);

(d) 42 CFR §483.30 (adequate physician oversight);

(e) Cal Health & Safety Code § 1279.6 (safety plan);

(f) Cal Health & Safety Code § 1337.1 (adequate training);

(g) Cal Health & Safety Code §1599.1(a) (adequate and qualified staff);

(h) Title 22 CCR §72311 (care plan and prompt reporting);

(i) Title 22 CCR §72315 (required services);

(j) Title 22 CCR §§72329(a) & 72501(e) (adequate staffing);

(k) Title 22 CCR § 72517 (adequate training);

(l) Title 22 CCR §72523 (adequate policies and procedures);

(m) Title 22 CCR § 72527(a)(11) (respect, dignity, & without abuse);

(n) Title 22 CCR § 72537 (reporting of communicable diseases);

(o) Title 22 CCR § 72539 (reporting of outbreaks);

(p) Title 22 CCR § 72541 (reporting of unusual occurrences);

(q) 42 USC §1396r(b)(2) (adequate plan of care);

Defendants' violations of these laws and regulations were a contributing factor to the death of Ricardo Saldana.

52.     By virtue of the foregoing, Defendants and each of them have acted in conscious disregard of the probability of injury to the Deceased, and because he was helpless to protect himself from exposure to the virus and Defendants failure and refusal to provide such basic care

12

and services is despicable. Accordingly, Defendants have each acted with malice.

53. By virtue of the foregoing, Defendants and each of them have acted despicably, and have subjected the Deceased to cruel and unjust hardship in conscious disregard of his rights and safety. Accordingly, Defendants have each acted with oppression.

54. By virtue of the foregoing, punitive damages should be assessed against Defendants and each of them, in a sum according to proof at trial.

**6.**

**THIRD CAUSE OF ACTION**

**(Custodial Negligence)**

PLAINTIFFS, INDIVIDUALLY, FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100, INCLUSIVE, AND EACH OF THEM, FOR NEGLIGENCE, ALLEGE:

55. Plaintiffs refer to each and every paragraph above and incorporate those paragraphs as though set forth in full in this cause of action.

56. Deceased was admitted as a resident at Glenhaven, located at 212 W Chevy Chase Dr, Glendale, CA 91204, for approximately the last six years of his life.

57. By virtue of the foregoing, Defendants and each of them owed a duty of ordinary care to the Deceased, to use that degree of care and skill that a reasonably prudent person would use, and to use that degree of care that a reasonably prudent nursing home would owe given its knowledge, training, expertise and skill.

58. Defendants and each of them breached the aforesaid duty of care by failing to implement policies, procedures, and safety measures necessary to prevent Ricardo's exposure to the coronavirus.

59. As a direct and legal result of the foregoing, the Deceased was injured in a sum according to proof at trial.

**7.**

**FOURTH CAUSE OF ACTION**

**(Wrongful Death)**

PLAINTIFFS FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100, INCLUSIVE, AND EACH OF THEM, FOR WRONGFUL DEATH, ALLEGE:

60. Plaintiffs incorporate by reference each and every of the foregoing paragraphs as though set forth in full in this cause of action.

61. As a direct and proximate result of the foregoing, Ricardo Saldana died and his heirs represented by Plaintiffs, have been deprived of his care, comfort and society to their general damages according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

AS TO THE FIRST CAUSE OF ACTION:
1. For special and general damages according to proof at the time of trial;
2. For punitive damages;
3. For attorney's fees and litigation costs;
4. For costs of suit incurred herein; and
5. For such other and further relief as the Court deems just and proper.

AS TO THE SECOND CAUSE OF ACTION:
6. For special and general damages according to proof at the time of trial;
7. For punitive damages;
8. For costs of suit incurred herein; and
9. For such other and further relief as the Court deems just and proper.

AS TO THE THIRD CAUSE OF ACTION:

10. For special and general damages according to proof at the time of trial;

11. For costs of suit incurred herein; and

12. For such other and further relief as the Court deems just and proper.

AS TO THE FOURTH CAUSE OF ACTION:

13. For general damages including loss of care, comfort and society of the deceased;

14. For costs of suit incurred herein; and

15. For such other and further relief as the Court deems just and proper.

Dated this 10th day of June 2020, at Claremont, California.

LAW OFFICES OF SCOTT GLOVSKY, APC

By: _____
SCOTT C. GLOVSKY
ARI DYBNIS
Attorneys for Plaintiffs

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury.

DATED:  June 10, 2020        LAW OFFICES OF SCOTT GLOVSKY, APC

By: _____
SCOTT C. GLOVSKY
ARI DYBNIS
Attorneys for Plaintiffs

# PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 343 Harvard Avenue, Claremont, California 91711.

On **June 10, 2020**, I served the foregoing documents described as:

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

on all interested parties in this action by placing [ ] the original [x]a true copy thereof enclosed in sealed envelopes addressed as follows:

**PLEASE SEE ATTACHED SERVICE LIST**

**[X] BY MAIL**
I caused such envelope to be deposited in the mail at Claremont, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date deposit for mailing in affidavit.

[ ] BY PERSONAL SERVICE
I caused to be delivered by hand to the above-listed addressees or to the addressees on the list attached hereto. A proof of service executed by the delivery person will be mailed under separate cover.

[ ] BY OVERNIGHT MAIL/COURIER
To expedite the delivery of the above-named document, said document was sent via overnight courier for next day delivery to the above-listed party.

[ ] BY ELECTRONIC MAIL
Pursuant to Emergency Rules Related to COVID-19, Emergency Rule 12, I caused the document(s) identified above to be transmitted electronically to the person(s) at the e-mail address(es) listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of California that the above is true and correct.

Executed on **June 10, 2020** at Claremont, California.

*Roberta Liao*
Roberta Liao

**SERVICE LIST**

| | |
|---|---|
| Glenhaven Healthcare LLC<br>3452 East Foothill Boulevard, Suite 710<br>Pasadena, CA 91107 | Caravan Operations Corp.<br>3452 East Foothill Boulevard, Suite 710<br>Pasadena, CA 91107 |
| Matthew Karp<br>3452 East Foothill Boulevard, Suite 710<br>Pasadena, CA 91107 | Benjamin Karp<br>c/o Matthew Karp<br>3452 East Foothill Boulevard, Suite 710<br>Pasadena, CA 91107 |